506 S.E.2d 554

**Jana Lynn TUDOR, Appellee,**

v.

**CHARLESTON AREA MEDICAL CEN-
TER, INC., a West Virginia Corpora-
tion, and Janice Smith, Appellants.**

No. 23948.

Supreme Court of Appeals of
West Virginia.

Submitted Oct. 7, 1997.

Decided Dec. 16, 1997.

Concurring and Dissenting Opinion of
Justice Maynard Dec. 19, 1997.

Maynard, J., filed separate opinion, con-
curring in part, and dissenting in part.

Kurt E. Entsminger, Donald B. O'Dell, Lamp, O'Dell, Bartram & Entsminger, Huntington, West Virginia, Attorneys for Appellee.

Stephen A. Weber, Kevin A. Nelson, Kay, Casto, Chaney, Love & Wise, Charleston, West Virginia, Attorneys for Appellants.

WORKMAN, Chief Justice:

This case is before the Court upon the appeal of Charleston Area Medical Center ("CAMC") and Janice Smith ("Appellant Smith") (collectively "Appellants") from the April 15, 1996, final order of the Circuit Court of Kanawha County denying the Appellants' motion for judgment notwithstanding the verdict, or, in the alternative, for a new trial, arising from a December 15, 1995,[1] jury trial wherein a verdict was returned in favor of the Appellee, Jana Lynn Tudor.

---

1. The judgment order was entered on January 2, 1996.

The jury awarded the Appellee $86,157 in special damages for lost wages, $500,000 in general damages for "damage to professional reputation, emotional distress and mental anguish," $1,000,000 in punitive damages against the Appellant CAMC, and $50,000 in punitive damages against the Appellant, Smith. The Appellants argue on appeal that the trial court erred: 1) in refusing to grant the Appellants' motion for a directed verdict on the Appellee's claim for constructive retaliatory discharge; 2) in submitting the Appellee's claim for tortious interference with employment opportunities to the jury, said claim being unsupported as a matter of law; 3) in failing to grant defendants a directed verdict on the Appellee's libel and slander claims; 4) in permitting the jury to consider the Appellee's invasion of privacy claim, said claim being unsupported as a matter of law; 5) in admitting the de la Torre memorandum into evidence; 6) in admitting the videotape deposition of Betty Tiernan into evidence; and 7) in submitting the issue of punitive damages to the jury and in failing to grant the Appellants' remittitur on the emotional distress and punitive damages awards. Based upon our review of the parties' briefs, arguments, and all other matters submitted before this Court, we affirm the trial court's decision, with the exception of the trial court's denial of the Appellants' motion for remittitur, which we reverse.

## I. FACTS

The Appellee, Jana Lynn Tudor, was initially employed by CAMC in 1988 as a registered nurse. From March 11, 1991, until July, 1993, she worked in the Adolescent Unit ("unit")[2] at Women's and Children's Hospital. Her supervisor while working in this unit was Appellant Smith, who was also the nurse manager. From the time she began working in the unit, the Appellee requested the weekend night shift[3] and worked it exclusively until she tendered her resignation in July of 1993.

The Appellee testified that she had also worked under the supervision of Debbie Carte, who was the nurse manager of the unit prior to Janice Smith. The Appellee stated that when she worked on the unit under Ms. Carte, she never worked alone, as there was always another nurse assigned to the unit. Problems on the unit began, according to the Appellee, when Appellant Smith took over the unit. Under Appellant Smith's supervision, the Appellee testified that she was assigned to work the unit alone "most of the time."[4] The Appellee testified that her assignment to work the shift alone raised concerns in her mind regarding patient safety. She also testified that she "felt like it was inadequate care because I couldn't be everywhere at one time...."

It is when the Appellee began to voice her concerns about having only one registered nurse assigned to a shift that "things went downhill[,]" according to her testimony. The first time the Appellee voiced her concern to Appellant Smith was in early October 1992. The Appellee testified that she left the unit to go into the Pediatrics Intensive Care Unit ("PICU") to have another nurse witness the Appellee waste[5] an unused portion of a narcotic. According to the Appellee's testimony, Zella White, the nursing supervisor, came to the unit, found no nurse there, and waited in

2. According to the testimony of Darlene Surbaugh, who was a registered nurse in the unit during the relevant time period, the unit had 14 beds and the ages of children on the unit ranged from 9 to 18 years. The nature of the illnesses of the children in this unit ranged from medical/surgical patients to patients with cystic fibrosis, cancer, seizure disorders and drug overdose. The unit also took overflow patients and often these patients were under the age of 9.

3. The weekend night shift was from 7:00 p.m. Friday night until 7:00 a.m. Saturday morning, from 7:00 p.m. Saturday night until 7:00 a.m. Sunday morning, and from 7:00 p.m. Sunday night until 7:00 a.m. Sunday morning.

4. According to Appellant Smith, when she became nurse manager, she began cost-cutting measures after careful assessment. One of those measures was to decrease staffing costs.

5. According to the Appellee's undisputed testimony, it was CAMC's policy that wasting of a narcotic was to occur when a patient needed part of a dosage of a narcotic. Under those circumstances, another registered nurse was required to witness the nurse draw the dosage and dispose of the remaining unused portion of the narcotic.

the unit until the Appellee emerged from the PICU. Ms. White questioned the Appellee as to why she had left the unit unattended. The Appellee proceeded to explain to Ms. White why she had left the unit. The Appellee also testified that she told Ms. White that there should be an additional nurse or care giver staffed on the unit.

Appellant Smith responded to the incident by issuing the following memorandum dated November 3, 1992, regarding "[l]eaving unit uncovered. 2 Rns needed:"

Zella shared ... [with] me your concern about not having 2 Rns on & going off the unit to waste a med. As Zella has already shared ... [with] you it was not necessary to leave the unit to waste a narcotic—it could have been left in lock up until supervisor came or when PICU nurse was free she could have come to you.

Unless the acuity warrants [sic] 2 Rns we cannot staff consistently ... [with] 2 Rns—we will be adding enough staff to always have 2, but when census ... [drops] the 2nd care giver may be pulled. If you have concerns, please let me know & I will come in to discuss them ... [with] you ... or if you have literature that supports your concern, please share it ... [with] me.

The Appellee testified that she never followed up with Appellant Smith's invitation to present her with literature supporting her position.[6]

The next time the Appellee raised any concern about the staffing problem was approximately one month later in November. At that time, the Appellee was on the floor alone when a seventeen-year-old adolescent girl needed to get out of the bed to use the restroom. The Appellee, without calling for any assistance, in contravention of hospital policy, got her up out of bed and into the bathroom, where the patient passed out. The Appellee tried to break the patient's fall; however, the patient hit her head on the floor. Just as this occurred, Ms. White, once again happened to come on the floor. Ms. White assisted the Appellee in getting the patient into a wheel chair.

On November 8, 1992, in compliance with hospital policy, the Appellee completed an incident report. Under the section entitled "Suggestions For Prevention of Future Occurrences? (Corrective Action Plan)," the Appellee wrote "[a]lways have *two* people staffed on floor...." Upon receipt of this incident report, Appellant Smith called the Appellee into her office, along with Ms. White. According to the Appellee, Appellant Smith expressed concern to the Appellee about the comments she had written regarding two individuals staffing the unit.[7] Essentially, Appellant Smith told the Appellee that staffing had nothing to do with the incident and, accordingly, her comments were incorrect. The Appellee testified that Appellant Smith got angry and upset with her over the comments.[8]

According to the Appellee, Appellant Smith was so infuriated with her for suggesting on these occasions that two persons should always be assigned to the unit that she retaliated against her. First, according to the Appellee's testimony, Appellant Smith instructed her to engage in unethical nursing practices concerning the disposal of narcotics. While the Appellee testified that it was unethical to lock up the unused portion of the

---

6. Appellant Smith further testified that no other nurses ever complained about having only one nurse assigned to the shift. The Appellee, however, produced several nurses who testified that complaints by various nurses had been voiced over this staffing concern. The Appellee further voiced her concerns to several supervisory employees including Johana McKitrick and Darlene Surbaugh, the charge nurses for the unit, Darla Brumfield, a nursing supervisor, and Mike King, CAMC's Vice President of Operations. The concerns raised by the Appellee with Mr. King occurred after the Appellee had left CAMC. Finally, Dr. Kisner testified that the Appellee had verbally told her that she had reported her concerns to

Janet Fairchild, the executive secretary for the West Virginia Board of Nurse Examiners. There was, however, no further evidence offered by the Appellee to substantiate this claim.

7. After the November 1992, the Appellee testified that an LPN was assigned to work the unit "[f]or a while."

8. Appellant Smith testified that she got upset with the Appellee over the comments, but the reason was the Appellee's suggestion that "that I am putting a patient in safety hazards, because I would never, ever do that."

narcotic until either a supervisor or PICU nurse could come to the unit, the Appellee was unable to cite to any applicable ethical provision or CAMC internal policy that contradicted Appellant Smith's instructions.

Next, the Appellee alleged that in early 1993, she obtained information from another employee that her evaluation had been downgraded. The Appellee met with Johana McKitrick, the charge nurse at the time, who confirmed to the Appellee that Appellant Smith had requested that her evaluation be changed.[9] The Appellee testified that when she inquired of Ms. McKitrick why this had occurred, Ms. McKitrick responded that, "Jana, I really—I can't tell you, I don't know. The only thing I can say is, I think she [Appellant Smith] just doesn't like you for some reason, and I can't give you the reason." [10]

The Appellee also introduced evidence that during this time period from November 1992 until July 1993, she made two to three requests to transfer off the unit. None of these requests resulted in an interview for the position she was attempting to transfer into. The Appellee, however, had been

granted a transfer in September of 1992 into the PICU.[11] The Appellee voluntarily turned down this transfer, even though the position paid the same salary and included the same benefits as she earned on the unit. Additionally, the Appellee claimed she was treated unfairly in her requests for vacation time. She requested the weekend of July 4, 1993, or the following weekend off and was denied that request. The Appellee testified that "most" of the other requests for time off during this same time period were granted.[12]

The Appellee was absent from her assigned shifts on May 28, 29, and 30, 1993. The Appellee called in sick for those shifts on May 28, 1993. She later presented a physician's note, dated June 3, 1993, advising her employer that she had been ill on those days. Under the CAMC attendance policy, which was admitted at trial, missing a shift scheduled the day before, the day of, or the day after a holiday resulted in two occasions of absence instead of the usual one. The CAMC attendance policy contained no provision for excused absences due to illness. Except for eight specifically stated exclusions from the policy, any day missed is treated as an absence.[13]

9. Ms. McKitrick testified that she had given the Appellee a very favorable evaluation, which was reflected in her narrative comments. In addition to the narrative comments, there are also numerical ratings that actually determine what pay raises, if any, are given. According to Ms. McKitrick, the highest numerical rating for ten different categories was an 8. Despite the favorable narrative commentary, Ms. McKitrick gave the Appellee a numerical rating of only 3.5 in half of the categories, which reflects an average performance. The Appellee testified that Ms. McKitrick told her that after she showed the favorable narrative commentary with favorable ratings to Appellant Smith, Appellant Smith instructed her to lower the ratings that Ms. McKitrick was prepared to give. What favorable numerical ratings Ms. McKitrick would have given was not introduced in evidence at trial.

10. Ms McKitrick denied that she told the Appellee that Appellant Smith asked that her evaluation be changed. Ms. McKitrick further denied that Appellant Smith had asked her to downgrade the Appellee's evaluation. The only evidence that would support that the evaluation was changed is that Ms. McKitrick's overwhelming favorable narrative commentary regarding the Appellee simply did not correlate with the numerical ratings on the same performance categories.

11. According to Appellant Smith's testimony, in the spring of 1993, the Appellee approached her and accused her of blocking the Appellee's transfers within CAMC. Appellant Smith denied that she had ever done this. Appellant Smith also told the Appellee that she had never been contacted by any manager within CAMC and asked to give a reference with regard to the Appellee. Appellant Smith then testified that the Appellee asked her what recommendation she would give if asked. The Appellant told the Appellee "I would tell them she was a good nurse, but she had an absenteeism problem."

12. Appellant Smith testified that four other nurses on the unit had requested vacation time before the Appellee had and that, during prime vacation time, the rule is first come-first served.

13. Further, under the attendance policy part-time employees, such as the Appellee, were to receive an oral warning if they incurred two occasions of absence within six months. If two additional occasions for absence occurred within six months of the oral warning, a written warning was given. Two more occasions of absence within six months of the written warning resulted in a one week suspension without pay. Two more occasions within six months of the suspension would result in the employee's discharge.

The Appellee testified that she subsequently decided to leave CAMC and gave her two weeks notice on June 25, 1993. The Appellee testified that her sole reason for submitting her resignation was her belief that staffing on the unit was not going to change. According to Appellant Smith, when an employee terminates employment at CAMC, it is hospital policy that the manager complete a "Personnel Action Form." As part of information provided on that form, the manager is required to state his or her opinion as to whether the employee should be re-hired by CAMC. If the manager's recommendation is that rehiring of the employee should not occur, the manager must specifically state reasons for that opinion. Appellant Smith indicated "no" on the form in response to the inquiry: "rehire? yes or no." The reasons given by Appellant Smith for that opinion was "absentism" [sic].[14] The Appellant sent the form to the personnel office for inclusion in the Appellee's permanent personnel file.

At the time the Appellee submitted her resignation, the evidence indicated that she had never been given a written warning for absenteeism[15] during her five-year tenure at CAMC.[16] On June 28, 1993, however, Ms. McKitrick, the Appellee's charge nurse, issued a written warning to the Appellee for absenteeism. The written warning, prepared by Ms. McKitrick, and signed by Ms. McKitrick and Appellant Smith, indicated that the Appellee had called in the day before a holiday and on the actual holiday and that the Appellee had been warned for this absenteeism offense on February 13, 1993. The Appellee, however, testified that she had never received a verbal warning for absenteeism on February 13, 1993. Additionally, the Appellee produced the time card for Ms. McKitrick which indicated that she had not worked on February 13, 1993, the day the verbal warning was purportedly issued. Further, there was evidence that normally the verbal warnings, while not kept in the personnel file, were kept in departmental files. The departmental file did not contain a record of the alleged February 1993 verbal warning.

After leaving CAMC, the Appellee applied for various positions at several health care facilities, including Thomas Memorial Hospital ("Thomas"). The only place that afforded the Appellee an interview was Thomas. The Appellee interviewed with two head nurses at Thomas, and both nurses prepared favorable interview forms which indicated that the Appellee should be hired. Records obtained from Thomas and introduced at trial indicated that Thomas' personnel office telephoned Linda Honaker, a personnel assistant at CAMC, requesting a reference for the Appellee. Ms. Honaker reviewed the Appellee's personnel file and informed the personnel office at Thomas that the Appellee had resigned and that she was recommended as a "no rehire" due to an absenteeism problem.[17] Ms. Honaker testified that there was an unwritten agreement with Thomas and St. Francis that these hospitals, along with CAMC, would release rehire eligibility information over the telephone, despite the CAMC policy that written authorization was required before such information would be released.[18]

---

**14.** The Appellants produced evidence at trial which indicated that from the day the Appellee began in the unit until the day she resigned, she was scheduled to work 340 shifts and failed to appear for 33 of those shifts. This equates to an absenteeism rate of approximately 10%.

**15.** The Appellee had received at least four other verbal warnings for absenteeism during her tenure at CAMC.

**16.** Ms. McKitrick also did not note that absenteeism was a problem on her written evaluation of the Appellee in the spring of 1993.

**17.** CAMC's policy on release of employee information to parties outside the medical center is as follows:

> Strict guidelines are followed before information about employees is released to parties outside the Medical Center. The information which may be released is limited to job performance, dates of employment, verification of salary, and rehire eligibility which is released only upon written authorization of the employee. Telephone information is limited to verification of dates of employment, job title and salary. Addresses and telephone numbers are not released.

**18.** While the Appellee had provided Thomas with written permission to inquire into her employment history with CAMC, CAMC was not in possession of that written authorization at the time Ms. Honaker gave Thomas the Appellee's employment information.

When the Appellee was not hired by Thomas, she testified that she took steps to try to ascertain what type of information CAMC was providing potential employers about her. The Appellee hired [19] Documented Reference Check ("D.R.C."), a California company, that performs reference checks to find out what, if any, negative information is being disclosed about a person to potential employers. On October 3, 1994, Eileen de la Torre, a D.R.C. representative, contacted Appellant Smith by telephone requesting employment information about the Appellee.[20] The report indicates that Appellant Smith told Ms. de la Torre that the Appellee had no noteworthy accomplishments; that her interpersonal skills with management were poor; that she had a tendency to brood and not express her needs clearly; that she had an attendance problem; and that Appellant Smith would not rehire the Appellee.

Appellant Smith vehemently denied ever having a conversation with Ms. de la Torre. The Appellant testified that the only conversation she ever had with anyone concerning the Appellee was the conversation previously mentioned, wherein she told someone at Strategic Ventures, Inc. ("SVI")[21] that the Appellee, while being a good nurse, did not like to work independently and had an absenteeism problem.[22]

**19.** The Appellee testified that she paid $65 to obtain a report.

**20.** Ms. de la Torre did not testify at trial. Instead, a reference check report was admitted in evidence under the business records exception. See W. Va. R. Evid. 803(6). The D.R.C. representative, in this case Ms. de la Torre, must be proficient in shorthand as a job requirement and initially records the entire telephone conversation between herself and the former employer, the Appellants in this case, using shorthand. Ms. de la Torre then prepares a report which is essentially a transcript of the telephone conversation that took place between herself and Appellant Smith. The report was admitted in evidence, over the Appellants' objection, during the testimony of Michael Rankin, the Chief Service Officer of D.R.C.

**21.** Appellant Smith specifically stated that the employee identified themself as being from Home Health Services, which is apparently a part of SVI. SVI is a related, but separate corporate entity from CAMC.

**22.** The Appellee applied for a job with SVI in November of 1993.

Finally, the Appellee offered the videotaped deposition of Betty Tiernan in evidence over the objection of the Appellants.[23] Ms. Tiernan had been employed as a nurse in the medical intensive care unit at CAMC's Memorial Division. She had never worked on the unit with either the Appellant Smith or the Appellee. She testified that she had also voiced concerns to both supervisors and others at CAMC about one nurse being assigned to a shift. Ms. Tiernan stated that when she voiced her concerns and complaints, she was invited to write a policy that would cover staffing and admission issues relating to her concerns. She was ultimately fired from CAMC for bringing a reporter into a CAMC management information meeting without the knowledge or permission of the speaker. She testified that she believed she was fired because she "wrote ... [a] letter to the newspaper and drew public attention perhaps in a negative light to CAMC."[24]

## II. DISCUSSION

### A. *CONSTRUCTIVE RETALIATORY DISCHARGE*

■ The first assignment of error [25] concerns whether the trial court erred in

**23.** The trial court allowed the videotape deposition in under Rule 404(b) of the West Virginia Rules of Evidence, on the basis that it was evidence of similar acts by CAMC.

**24.** The letter criticized CAMC for cutting nurses' merit pay from 8 percent to 4 percent annually, for decreasing matching funds for nurses retirement accounts, and for reducing educational assistance and conference moneys for employees.

**25.** At the outset, we note that the verdict form used allowed the jury to award both special (lost wages) and general (emotional distress, mental anguish, damage to professional reputation) damages as long as the jury found, by a preponderance of the evidence, that liability existed as to any one of the five cause of actions (retaliatory discharge, tortious interference, defamation, invasion of privacy and intentional infliction of emotional distress) alleged by the Appellee. The jury found liability existed as to every cause of action averred by the Appellee, including intentional infliction of emotional distress. The Appellants allege no error in submitting that cause of action to the jury and, in fact, state in their reply brief that "[t]here was no opportunity for

refusing to grant the Appellants' motion for a directed verdict on the Appellee's claim for constructive retaliatory discharge. The Appellants contend that the Appellee failed, as a matter of law, to show that any of her actions were in support of a substantial public policy of this state and to establish the necessary elements of a constructive retaliatory discharge. In contrast, the Appellee maintains that the trial court did not err in submitting her claim to the jury because substantial public policies were involved in this case and ample evidence to sustain the finding of a constructive discharge was presented to the jury.

■■■ Before undertaking a review of the error alleged, we set forth the standard of review to be utilized in syllabus point one of *Alkire v. First National Bank*, 197 W.Va. 122, 475 S.E.2d 122 (1996):

> In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a denial of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally insufficient to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

197 W.Va. at 124, 475 S.E.2d at 124, Syl. Pt. 1, in part. Further, in *Dodrill v. Nationwide Mutual Insurance Co.*, 201 W.Va. 1, 491

S.E.2d 1 (1996), we stated that "[e]ssentially, the same rules apply where motions for a directed verdict are implicated." *Id.* at 9, 491 S.E.2d at 9.

■■■ In order to prevail under a constructive retaliatory discharge theory, the Appellee must prove that a "substantial public policy" of this state has been violated. As this Court held in the syllabus of *Harless v. First National Bank* ("Harless I"), 162 W.Va. 116, 246 S.E.2d 270 (1978):

> The rule that an employer has an absolute right to discharge an at will employee must be tempered by the principle that where the employer's motivation for the discharge is to contravene some substantial public policy principle, then the employer may be liable to the employee for damages occasioned by this discharge.

*Id.* at 116, 246 S.E.2d at 271. "To identify the sources of public policy for purposes of determining whether a retaliatory discharge has occurred, we look to established precepts in our constitution, legislative enactments, legislatively approved regulations, and judicial opinions." Syl. Pt. 2, *Birthisel v. Tri-Cities Health Servs. Corp.*, 188 W.Va. 371, 424 S.E.2d 606 (1992). Finally, "[i]nherent in the term 'substantial public policy' is the concept that the policy will provide specific guidance to a reasonable person." *Id.* at 372, 424 S.E.2d at 607, Syl. Pt. 3.

In numerous prior decisions, this Court has identified specific instances of what qualifies as substantial public policy. *See, e.g.,* Syl. Pt. 4, *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996) (finding substantial public policy violation when at-will employee was discharged based on concern that employee has given or

---

the ... Appellants to object to the submission of ... Appellee's emotional distress claim and punitive damage claim prior to the jury's verdict because ... [Appellee] was entitled to jury consideration of both elements of damages."

We previously held with regard to general verdicts that

> [w]here a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by the evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues.

Syl. Pt. 6, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983), *cert. denied*, 469 U.S. 981, 105 S.Ct. 384, 83 L.Ed.2d 319 (1984). Similarly, in cases such as the instant case, where the jury makes special findings, we will not reverse the verdict where multiple issues are presented, if the verdict is supported by the evidence on at least one issue. Consequently, because we uphold the lower court on both the constructive retaliatory discharge and tortious interference of employment opportunities issues, we find it unnecessary to address the assignments of error raised by the Appellants with respect to defamation and invasion of privacy.

may be called to give truthful testimony in legal action); Syl. Pt. 4, *Roberts v. Adkins*, 191 W.Va. 215, 444 S.E.2d 725 (1994) (holding that cause of action for wrongful discharge may exist under West Virginia Code § 21–5–5, which sets forth criminal liability for employers who coerce employees to purchase goods in lieu of wages); *Slack v. Kanawha County Hous. & Redevelopment Auth.*, 188 W.Va. 144, 423 S.E.2d 547 (1992) (finding generally that substantial public policy implicated where employee brings attention of federal prosecutors to improprieties in operation of housing authority); Syl. Pt. 2, *Lilly v. Overnight Transp. Co.*, 188 W.Va. 538, 425 S.E.2d 214 (1992) (holding that substantial public policy is predicated upon West Virginia Code § 17C–15–1(a), § 17C–15–31 and § 24A–5–5(j), relating to operation of motor vehicle with brakes in unsafe working condition); Syl. Pt. 2, *Collins v. Elkay Mining Co.*, 179 W.Va. 549, 371 S.E.2d 46 (1988) (holding that substantial public policy arises from West Virginia Mine Safety Act, West Virginia Code § 22A–1A–20); Syl. Pt. 2, *McClung v. Marion County Comm'n*, 178 W.Va. 444, 360 S.E.2d 221 (1987) (holding that substantial public policy is grounded in Wage and Hour Act, West Virginia Code § 21–5C–8); Syl. Pt. 2, *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980) (holding that substantial public policy arises from Workers' Compensation Act, West Virginia Code § 23–5A–1).

In the present case, the Appellee maintains that a substantial public policy emanates from West Virginia Code of State Regulations § 64–12–14.2.4(1987),[26] which is a regulation promulgated by the West Virginia Board of Health and is part of a regulatory scheme governing the licensure of hospitals.[27] That regulation provides that:

14.2.4. There shall be an adequate number of licensed registered professional nurses to meet the following minimum staff requirements:

. . . .

d. A registered professional nurse shall be on duty and immediately available for bedside care of any patient when needed on each shift, 24 hours per day and seven days a week.

e. Licensed practical nurses as needed to supplement registered professional nurses in appropriate ratio to professional nurses.

f. Auxiliary workers as needed to provide physical care and assist with simple nursing and clerical procedures not requiring professional nurses.

*Id.* The above-referenced regulation not only mandates that an "adequate" number of registered nurses be available to meet "minimum" staffing requirements, but it also mandates that "[a] registered professional nurse shall be ... *immediately* available for bedside care of any patient when needed...." *Id.* (emphasis added).[28]

The Appellants maintain that because this regulation is "too general to provide any specific guidance or is so vague that it is subject to different interpretations[,]" they should not be exposed to liability under this Court's pronouncements in *Birthisel*.[29] *See*

---

**26.** West Virginia Code of State Regulations § 64–12–14.2.4 (1987) was amended in 1994. The changes to § 64–12–14.2.4 were minor and have no impact on the outcome of this decision.

**27.** The legislature authorized the West Virginia Board of Heath to enact such regulations governing hospitals in West Virginia Code § 16–5B–8 (1995) "to protect patients in institutions ... from detrimental practices and conditions, or to ensure adequate provision for their accommodations and care." *Id.*

**28.** The Appellee also introduced in evidence the hospital guidelines which indicated that more than one nurse or care giver was required on any give shift. Further, Rachel Byrd, CAMC's Director of Nursing, testified that between 1991 and 1993, the unit was consistently understaffed according to CAMC's own Medicus records. According to Ms. Byrd, the practice of assigning only one nurse per shift on the unit also contravened internal policies adopted by CAMC's nursing administrators which required a minimum of two care givers per shift. Finally, Dr. Deborah Kisner, Professor and Director of Nursing Education at Fairmont State College, testified that CAMC's practice of routinely assigning only one nurse to the unit was unsafe.

**29.** The Appellants also rely upon this Court's decision in *Bowe v. Charleston Area Medical Center, Inc.*, 189 W.Va. 145, 428 S.E.2d 773 (1993), to support their contention that the regulations relied upon by the Appellee did not constitute a substantial public policy. *"Per curiam* opinions [, however,] ... are used to decide only the

188 W.Va. at 377, 424 S.E.2d at 612. In *Birthisel,* the plaintiff relied upon general admonitions relating to the requirement of good care for patients by social workers found in regulations established by the West Virginia Social Work Board as a basis for her retaliatory discharge claim, when she was forced to resign because of her failure to transfer data from various records onto master treatment plans. Finding that those general admonitions "contain[ed] no specific provision relating to a patient's record review" and were "extremely general," this Court concluded that the regulations "d[id] not constitute a specific statement of public policy." *Id.* at 379, 424 S.E.2d at 614. In arriving at this conclusion, we further noted in *Birthisel,* however, that " '[t]he employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes[.]' " *Id.* at 377, 424 S.E.2d at 612 (quoting *Gantt v. Sentry Ins.,* 1 Cal.4th 1083, 1095, 4 Cal. Rptr.2d 874, 882, 824 P.2d 680, 688 (1992)).

■ In the instant case, it does not take an in-depth analysis for this Court to hold that West Virginia Code of State Regulations § 64–12–14.2.4 sets forth a specific statement of a substantial public policy which contemplates that a hospital unit will be properly staffed to accommodate the regulation's directive; to ensure that patients are protected from inadequate staffing practices; and to assure that medical care is provided to hospital patients, especially children and young adolescents, who must depend upon others to protect their medical interests and needs.[30]

We now turn to whether the Appellee established the necessary elements of a constructive retaliatory discharge. The Appellants argue that there is a complete absence of factual elements which substantiates a constructive discharge. The Appellants further allege that the Appellee was never threatened with discharge and was never urged to resign. Her pay and benefits were never reduced. Her job responsibilities were not altered in any way and there was no evidence of an unfair or unfavorable job. In other words, the Appellants argue that there was a lack of any evidence that the Appellee was involuntarily subjected to employment conditions that would force a reasonable person to end their employment, or that the conditions imposed upon her were different than those placed upon other employees. In contrast, the Appellee contends that there was ample evidence to sustain the jury's finding of a constructive discharge.

■ Under the law enunciated by this Court in *Slack v. Kanawha County Housing & Redevelopment Authority,* 188 W.Va. 144, 423 S.E.2d 547 (1992):

[w]here a constructive discharge is claimed by an employee in a retaliatory discharge case, the employee must prove sufficient facts to establish the retaliatory discharge. In addition, the employee must prove that the intolerable conditions that caused the employee to quit were created by the employer and were related to those facts that gave rise to the retaliatory discharge.

In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer were so intolerable that a reasonable person would be compelled to quit. It is not necessary, however, that a plaintiff prove that the employer's actions were taken with a specific intent to cause the plaintiff to quit.

*Id.* at 146, 423 S.E.2d at 549, Syl. Pts. 5 and 6.

In the present case, the evidence presented by the Appellee revealed that she regularly worked her shifts for over two years alone, without either another nurse or care giver to assist her. Moreover, at times, she was left alone on her shift to care for up to nine seriously ill patients. During this time peri-

specific case before the Court; everything in a per curiam opinion beyond the syllabus point is merely *obiter dicta." Lieving v. Hadley,* 188 W.Va. 197, 201, 423 S.E.2d 600, 604 n. 4 (1992).

**30.** Whether the staffing practice at issue created a substantial danger to the safety of the public is a factual determination. Similarly, whether the employee was discharged for bringing attention to the staffing practice is also a factual determination in each case. *See Lilly,* 188 W.Va. at 541–42, 425 S.E.2d at 217–18 and n. 6.

od, the evidence indicated that the Appellee raised her concerns about the staffing situations to other nurses who worked in the unit. Twelve nurses on this unit ultimately requested and received transfers to other CAMC units. Moreover, after November 1992, the evidence established that she was the recipient of reprisals for voicing concerns about the staffing situation. First, she was reprimanded by Appellant Smith for placing those concerns in an incident report. Appellant Smith testified that she became angry with the Appellee over the comments. The evidence further revealed that in early 1993, Appellant Smith directed that the Appellee's spring evaluation be downgraded, allegedly as a result of the complaints she made, which reduced her merit raise. The Appellee presented additional evidence that her requests for vacation time [31] and her attempts to transfer to other units were denied.[32] Finally, the Appellee testified that these working conditions became intolerable. She stated that she felt like the conditions were never going to change and that professionally and ethically, "I couldn't be a part of that."

In viewing the evidence in the light most favorable to the Appellee, who was the nonmoving party, it is clear that the Appellee presented sufficient evidence of constructive retaliatory discharge to send the issue to the jury.[33] *See Alkire,* 197 W.Va. at 124, 475 S.E.2d at 124, Syl. Pt. 1, in part. Consequently, we conclude that the trial court did not err in refusing to direct a verdict in favor of the Appellants on this issue.

**31.** As previously mentioned, Appellant Smith testified that the rule regarding vacation time under the circumstances alleged was first come-first served, and four other nurses had already requested vacation time, prior to the Appellee's request being made. *See infra* note 12.

**32.** While the Appellee claimed that Appellant Smith blocked her requested transfers, Appellant Smith testified that she had not blocked any of the Appellee's requested transfers and further, she had never been contacted by another manager within CAMC about the Appellee.

**33.** We note that this Court makes no findings on these issues. The Appellee's evidence supporting her case was contested by the Appellants at every turn. The only question before us is whether sufficient evidence was presented to support the Appellee's claim and to make the matter a jury question.

### B. *TORTIOUS INTERFERENCE*

■ The next alleged error concerns whether the trial court erred in submitting the Appellee's tortious interference with employment opportunities claim for jury determination. The Appellants maintain that the Appellee's claim was based upon her allegation that CAMC and Janice Smith provided adverse information to prospective employers regarding the Appellee's employment with CAMC. The Appellants contend, however, that the Appellee produced no definitive evidence that Appellant Smith ever communicated with a prospective employer about the Appellee and that the only evidence as to any communication by CAMC was the information conveyed to Thomas by Ms. Honaker, a personnel assistant at Women's and Children's, in response to an inquiry specifically authorized by the Appellee. With regard to the information provided by Ms. Honaker, the Appellants argue that it cannot form the basis for liability against CAMC because such information was protected by a release signed by the Appellee, was privileged, and was not tortious, because it was completely true. The Appellee contends, however, that the release provision on the Thomas application form did not absolve the Appellants of liability for wrongful conduct and that no qualified privilege applied to the Appellants' malicious conduct against the Appellee.

■ This error is predicated upon the following release [34] executed by the Appellee

**34.** The Appellee asserts in a footnote that "the '... [Appellants] were also procedurally barred from asserting this defense at trial since it was never properly pled as an affirmative defense as required by W.V.R.C.P. Rule 8(c)." The Appellants responded to this assertion raised by the Appellee in her response to the Appellants' motion before the lower court. The Appellants maintained that they could not have raised the release as an affirmative defense at the time their answer to the complaint was filed because they did not know that such release existed until it was produced during discovery. While the pleading of release is an affirmative defense that should be raised in an answer to a complaint, "West Virginia Rule of Civil Procedure 15(b) provides that when issues not raised by the pleadings 'are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.'" *State, Dep't of Health and Human Re-*

when she completed the employment application with Thomas: "I hereby authorize Herbert J. Thomas Memorial Hospital to make a thorough investigation of my past employments and all the facts stated on my application for employment. I release from all liability or responsibility all persons, places of business, and municipalities supplying such information." It is well established in this jurisdiction that when a person gives another entity a release, the release does not absolve a party from liability for the party's intentional, reckless or grossly negligent conduct. *See Murphy v. North Am. River Runners, Inc.*, 186 W.Va. 310, 316, 412 S.E.2d 504, 510 (1991) (stating that "a general clause in an exculpatory agreement or anticipatory release exempting the defendant from all liability for any future negligence will not be construed to include intentional or reckless misconduct or gross negligence, unless such intention clearly appears form the circumstances") (citing Restatement (Second) of Torts § 496B cmt. d (1963, 1964)). Moreover, "in order for the express agreement ... [to 'release from all liability or responsibility all persons, places or business, and municipalities supplying such information'] to be effective, it must also appear that its terms were intended by both parties to apply to the particular conduct of the defendant which has caused the harm." [35] 186 W.Va. at 316, 412 S.E.2d at 510.

It is undeniable that when the Appellee signed the above-mentioned information, she

was not giving the Appellants carte blanche authorization to release false information about her.[36] Further, the Appellee presented testimony from Appellant Smith herself that she had conveyed information to a potential employer over the phone, in violation of hospital policy, that the Appellee had an absenteeism problem and was a "no rehire" at CAMC. The evidence presented at trial demonstrated that the same employment information was conveyed by Ms. Honaker to Thomas.

 With regard to the qualified privilege claimed by the Appellants,

[q]ualified privileges are based upon the public policy that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public. A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter; however, a bad motive will defeat a qualified privilege defense.

Syl. Pt. 4, *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994).

There was ample evidence presented to the jury from which it could find that the Appellants acted with a "bad motive" towards the Appellee.[37] This evidence included Appellant Smith's testimony that she was

---

sources, *Child Advocate Office ex rel. Robert Michael B. v. Robert Morris N.*, 195 W.Va. 759, 764, 466 S.E.2d 827, 832 (1995). It is clear, upon review of the record, that the issue was clearly tried by the "express or implied consent" of the parties, insomuch as the Appellee never raised any objection or made any argument with respect to this issue at trial. *Id.*

**35.** Some jurisdictions have determined that a party's attempt to absolve itself from liability for an intentional tort is against public policy. *See Reece v. Finch*, 562 So.2d 195, 200 (Ala.1990); *Kellums v. Freight Sales Centers, Inc.*, 467 So.2d 816, 817 (Fla.Dist.Ct.App.1985). Other jurisdictions have simply held such exculpatory clauses invalid if they purport to exonerate a party from willful, wanton or reckless conduct or from an intentional tort. *See Jones v. Dressel*, 623 P.2d 370, 376 (Colo.1981); *Winterstein v. Wilcom*, 16 Md.App. 130, 293 A.2d 821, 824–25 (Md.Ct.App. 1972).

**36.** Whether the information released by CAMC and Appellant Smith concerning Appellee's absenteeism problem that resulted in her "no rehire" status was false is not for this Court to determine as it was a question of fact for the jury to decide. *See Crump v. Beckley Newspapers, Inc.* 173 W.Va. 699, 710, 320 S.E.2d 70, 81 (1983) (stating that "th[e] controversy as to the underlying truth or falsity of the statements" is a question of fact for the jury).

**37.** Again, whether such a bad motive or malice existed in this case was properly left for the jury to determine. *See* Syl. Pt. 3, *Stewart v. Riley*, 114 W.Va. 578, 172 S.E. 791 (1934) ("Given a privileged occasion and words within the scope of the privilege as established facts, the question of whether the utterance was malicious is for the jury.").

upset and angry when the Appellee stated in an incident report that the reason a patient fell was due to inadequate staffing. There was also evidence of: the Appellee's requests for transfers and vacation requests that were denied; the Appellee's narrative performance evaluation which was favorable; but, the accompanying numerical evaluation which was average, purportedly due to Appellant Smith's request that the evaluation be downgraded; Appellant Smith's violation of CAMC's confidentiality policies when she shared negative information about the Appellee's employment at CAMC over the telephone with a third-party outside CAMC; and the fact that the Appellee had no negative history of absenteeism in her personnel file until Appellant Smith placed it there after the Appellee had tendered her resignation which was also the same day that Appellant Smith indicated that the Appellee was a "no rehire" due to absenteeism. Thus, there was a basis upon which the jury could have concluded that collectively this evidence revealed ill-will or malice between Appellant Smith and the Appellee. This "bad motive" would necessarily defeat any qualified privilege defense asserted by the Appellants. Thus, the trial court did not err in submitting the tortious interference claim to the jury.

## C. ALLEGED EVIDENTIARY ERRORS

The Appellants maintain that the trial court committed reversible error in admitting the de la Torre memorandum and in admitting the videotaped deposition of Betty Tiernan into evidence. It is important to note that

> [t]he West Virginia Rules of Evidence . . . allocate significant discretion to the trial court in making evidentiary . . . rulings. Thus, rulings on the admission of evidence . . . are committed to the discre-

tion of the trial court. Absent a few exceptions, this Court will review evidentiary . . . rulings of the circuit court under an abuse of discretion standard.

Syl. Pt. 1, in part, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

With regard to the de la Torre memorandum, the Appellants assert that it was irrelevant, highly prejudicial and did not fall within the business records exception [38] to the hearsay rule. First, the relevancy issue is easily resolved based upon our prior decision in *McDougal*, where we stated:

> Rule 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility. For example, the offered evidence does not have to make the existence of a fact to be proved more probable than not or provide a sufficient basis for sending the issue to the jury.

*Id.* at 236, 455 S.E.2d at 795. It is clear the report was properly admitted under West Virginia Rules of Evidence 401 and 402. The report demonstrated that Appellant Smith exhibited ill-will toward the Appellee. Further, it was relevant with regard to the Appellee's intentional infliction of emotion distress claim insofar as it clearly revealed the wrongful and deliberate sharing of the Appellee's negative employment history with a party outside of CAMC which was in clear violation of hospital policy.

Moreover, the report was properly admitted under the business record excep-

---

**38.** West Virginia Rule of Evidence 803(6) provides:

> Records of regularly conducted activity.—A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, rec-

> ord, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.
> *Id.*

tion to the hearsay rule. *See* W. Va. R. Evid. 803(6). This Court has held that

> "Records made routinely in the regular course of business, at the time of the transaction or occurrence, or within a reasonable time thereafter, are generally trustworthy and reliable, and therefore ought to be admissible when properly verified." Syl. Pt. 4, *State v. Fairchild*, 171 W.Va. 137, 298 S.E.2d 110 (1982).

Syl. Pt. 3, *Daniel B. ex rel. Richard B. v. Ackerman*, 190 W.Va. 1, 435 S.E.2d 1 (1993).

In this case, Michael Rankin, the Chief Service Officer of D.R.C., testified that the de la Torre memorandum was prepared in the regular course of D.R.C.'s business activities on the same day that the reference check occurred. The report was prepared from the transcription notes taken during the reference check and the report was closely reviewed by the D.R.C. representative, in this case de la Torre, and a supervisor. Finally, in order to assure the accuracy of the report, it must be signed by the D.R.C. representative, in this case Ms. de la Torre, under penalty of perjury.[39] Consequently,

we cannot conclude that the trial court erred in admitting the de la Torre memorandum.

■ Next, the Appellants also assert that the Betty Tiernan videotaped deposition was improperly admitted under West Virginia Rule of Evidence 404(b)[40] as similar acts evidence to prove CAMC's improper motive and intent concerning the Appellee. The Appellants argue that not only did the trial court fail to conduct an in camera hearing, but that Ms. Tiernan's testimony failed to meet the requisites set forth in *State v. McGinnis*, 193 W.Va. 147, 455 S.E.2d 516 (1994), for the evidence to be admissible.[41] In contrast, the Appellee maintains that the evidence was properly admitted under Rule 404(b) to show the following:

1. That similar to Jana Tudor, Betty Tiernan was formerly employed as a nurse by CAMC.

2. That similar to Jana Tudor, Betty Tiernan voiced complaints to CAMC about unsafe staffing practices on her unit.

3. That similar to Jana Tudor, Betty Tiernan's complaints related to the practice of assigning only one nurse on a unit.

**39.** We find that the Appellants' contention that the de la Torre memorandum lacks a sufficient indicia of trustworthiness to be considered a business record is without merit. Further, the Appellants' reliance upon *Palmer v. Hoffman*, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, *reh'g denied*, 318 U.S. 800, 63 S.Ct. 757, 87 L.Ed. 1163 (1943), to support their contention is factually distinguishable from the instant case. In *Palmer*, an accident report prepared by a railroad engineer in connection with a crossing accident was found inadmissible as a business record. The Supreme Court, in upholding the inadmissibility of the report, stated:

> In short, it is manifest that in this case those reports are not for the systematic conduct of the enterprise as a railroad business. Unlike payrolls, accounts receivable, accounts payable, bills of lading and the like, these reports are calculated for use essentially in the court, not in the business. Their primary utility is in litigating, not in railroading.

*Id.* at 114, 63 S.Ct. 477; *see In re Estate of Solomon ex rel. Solomon v. Shuell*, 435 Mich. 104, 457 N.W.2d 669, 677 (Mich.1990) (*"Palmer* has subsequently been read to stand for the proposition that the trial court, in its discretion, may exclude evidence meeting the literal requirements of the business records exception where the underlying circumstances indicate a lack of the trustworthiness business records are presumed to have"). In the instant case, the trial court did not abuse its discretion in determining

that the record had the necessary requisite of trustworthiness to compel its admission in evidence.

**40.** West Virginia Rule of Evidence 404(b) provides:

> (b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show *that other purposes, such as proof of motive,* opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
>
> *Id.*

**41.** The Appellants assert that the testimony was improperly admitted as a similar act because Ms. Tiernan never worked in the Adolescent Unit, never worked with the Appellee, and was never under the supervision of Appellant Smith. Further, according to the Appellants, Ms. Tiernan was fired by CAMC for allegedly bringing a reporter to a meeting where the speaker did not know that the reporter was present, which is completely inapposite to the issues in the instant case.

4. That similar to Jana Tudor, Betty Tiernan was forced to leave her employment within a few months after making these staffing complaints.

5. That similar to Jana Tudor, Betty Tiernan subsequently encountered difficulties in finding other nursing employment in the Kanawha Valley area.

 In *McGinnis*,[42] we set forth the following procedure for evaluating the admissibility of Rule 404(b) evidence:

Where an offer of evidence is made under Rule 404(b) of the West Virginia Rules of Evidence, the trial court, pursuant to Rule 104(a) of the West Virginia Rules of Evidence, is to determine its admissibility. Before admitting the evidence, the trial court should conduct an *in camera* hearing as stated in *State v. Dolin*, 176 W.Va. 688, 347 S.E.2d 208 (1986). After hearing the evidence and arguments of counsel, the trial court must be satisfied by a preponderance of the evidence that the acts or conduct occurred and that the defendant committed the acts. If the trial court does not find by a preponderance of the evidence that the acts or conduct was committed or that the defendant was the actor, the evidence should be excluded under Rule 404(b). If a sufficient showing has been made, the trial court must then determine the relevancy of the evidence under Rules 401 and 402 of the West Virginia Rules of Evidence and conduct the balancing required under Rule 403 of the West Virginia Rules of Evidence. If the trial court is then satisfied that the Rule 404(b) evidence is admissible, it should instruct the jury on the limited purpose for which such evidence has been admitted. A limiting instruction should be given at the time the evidence is offered, and we recommend that it be repeated in the trial court's general charge to the jury at the conclusion of the evidence.

*Id.* at 151, 455 S.E.2d at 520, Syl. Pt. 2.

Contrary to the Appellants' assertion, the trial court conducted an in camera hearing, wherein the court allowed the parties to submit briefs on the admissibility of this evidence, as well as to present oral argument on the issue. Further, the trial court reviewed the videotape and read the accompanying transcript prior to making its ruling. Upon this careful review of the evidence, the trial court concluded:

I think based on the evidence that has been presented to the Court that I am prepared to make a finding that first of all, only as to the defendant CAMC—not as to the defendant Janice Smith, the defendant CAMC—that there certainly is more than a preponderance of the evidence that the defendant committed these acts.

I find that they in fact are similar in nature to the conduct, at least on certain of the counts or elements in this plaintiff's case. I am willing and will be telling—well, first of all, under 403, the Court finds that they are more relevant than they are prejudicial. Probative value is that which has been enumerated in all these in all these briefs and which I will be incorporating into an order.

I think this has been one matter that has been fully briefed by both sides. The Court will tell the jury that they can only consider this as to CAMC defendant and only on the issue of intent, motive and state of mind.

Based upon a review of the record in this case, this Court concludes that the lower court properly followed the procedure established by *McGinnis* for evaluating the admissibility of the similar acts evidence under West Virginia Rule of Evidence 404(b). Consequently, the trial court did not abuse its discretion in allowing the evidence to be admitted.[43]

### D. *EMOTIONAL DISTRESS AND PUNITIVE DAMAGES AWARD*

 The last issue concerns whether the trial court erred in failing to grant the Appel-

---

42. We have recognized the application of *McGinnis* for purposes of determining the admissibility of Rule 404(b) evidence in the civil context in *Stafford v. Rocky Hollow Coal Co.,* 198 W.Va. 593, 482 S.E.2d 210 (1996) (involving former employee's wrongful discharge action against former employer, its president and parent corporations).

43. The trial court offered a limiting instruction to the jury prior to the playing of the videotaped deposition.

lants' motion for remittitur on the emotional distress and punitive damages awards.[44] The Appellants assert that the circuit court failed to recognized the dangers warned of by this Court in *Harless v. First National Bank* ("Harless II"), 169 W.Va. 673, 289 S.E.2d · 692 (1982), and *Dzinglski*,[45] which were manifested in the jury's verdict. The Appellants maintain that "[t]he ... [Appellee's] paucity of evidence regarding the alleged emotional distress she suffered makes it obvious that, on its face, the jury's award of $500,000 in damages for this claim was excessive and necessarily contained a punitive element." The Appellee, however, asserts that the award of punitive damages was consistent with this Court's decision in *Harless II.*

■ Much confusion has arisen regarding whether an award of punitive damages can be made where damages for intentional infliction of emotional distress have already been awarded. Today, we attempt to resolve this confusion. We begin by reexamining the first case in which we held that both damages for intentional infliction of emotional distress and punitive damages could be awarded. In *Harless II*, we held in syllabus point five that:

> Because there is a certain openendedness in the limits of recovery for emotional distress in a retaliatory discharge claim, we decline to automatically allow a claim for punitive damages to be added to the damage picture. We do recognize that where the employer's conduct is wanton, willful or malicious, punitive damages may be appropriate.

169 W.Va. at 674, 289 S.E.2d at 694, Syl. Pt. 5. We further stated that " '[t]he recovery for emotional distress as well as other compensatory damages such as lost wages should adequately compensate the plaintiff.' " *Id.* at 692, 289 S.E.2d at 703. We also cautioned that "a claim for emotional distress without

any physical trauma may permit a jury to have a rather open-hand in the assessment of damages. Additionally, a jury may weigh the defendant's conduct in assessing the amount of damages and to this extent[,] emotional distress damages may assume the cloak of punitive damages." *Id.* at 690, 289 S.E.2d at 702.

■ More recently, however, in syllabus point eight of *Dzinglski*, we held:

> In permitting recovery for emotional distress without proof of physical trauma when the distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages.

191 W.Va. at 281, 445 S.E.2d at 222, Syl Pt. 8. This holding in *Dzinglski* was predicated upon language from our previous decision in *Mace v. Charleston Area Medical Center Foundation, Inc.*, 188 W.Va. 57, 422 S.E.2d 624 (1992), wherein we expressed "our concern that in cases where damages for emotional distress are sought, 'a claim for emotional distress without any physical trauma may permit a jury to have a rather open-hand in the assessment of damages.' " 191 W.Va. at 288, 445 S.E.2d at 229 (quoting *Harless II*, 169 W.Va. at 690, 289 S.E.2d at 702); *see also Wells v. Smith*, 171 W.Va. 97, 104, 297 S.E.2d 872, 879 (1982) *overruled on other grounds by Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) (recognizing that cause of action for tort of outrageous conduct permits recovery of damages for emotional distress without proof of physical trauma where distress arises out of extreme and outrageous conduct intentionally or recklessly caused by defendant and that "[d]amages awarded for the

---

**44.** While the Appellants also couch this assignment of error in terms of the trial court erring in submitting the issue of punitive damages to the jury, the Appellants never objected to this at trial. Indeed, the Appellants offered their own jury instruction on the issue, as well as agreed to the issue being placed on the verdict form. Thus, we will only address the remittitur issue as it relates

to whether the damages for intentional infliction of emotional distress and punitive damages awarded by the jury are duplicative under this Court's decision in *Dzinglski*. *See* 191 W.Va. at 281, 445 S.E.2d at 222, Syl. Pt. 8.

**45.** *See* 191 W.Va. 278, 445 S.E.2d 219.

tort of outrageous conduct are essentially punitive damages").

In *Dzinglski,* the lower court allowed the issue of punitive damages to go to the jury; however, the lower court struck the award of punitive damages based upon the defendant's post-trial motion objecting to the award. Specifically, we stated that

> [b]y allowing the jury to consider punitive damages, the trial court permitted the jury to stack punitive damages upon punitive damages, thereby effectively imposing two punitive damage verdicts against Weirton Steel for the same acts. The trial court's decision to dismiss Mr. Dzinglski's claim for punitive damages correctly avoided this double recovery.

191 W.Va. at 288, 445 S.E.2d at 229.

The quandary results because, according to *Harless II,* there are cases where both damages for intentional infliction of emotional distress and punitive damages are proper; but, by the same token, under *Dzinglski,* there are also circumstances where punitive damages are to be considered double recovery where damages for intentional infliction

for emotional distress with no physical trauma are also awarded by the jury. In attempting to clarify the law on this issue, we focus on a delineation of specific circumstances under which jury awards for both intentional infliction of emotional distress and punitive damages will be considered a double recovery.[46]

 This issue arises in connection with claims of intentional infliction of emotional distress without proof of physical injury. *See Harless II,* 169 W.Va. at 690, 289 S.E.2d at 702 and *Dzinglski,* 191 W.Va. at 281, 445 S.E.2d at 222. In cases where the jury is presented with an intentional infliction of emotional distress claim, without physical trauma or without concomitant medical or psychiatric proof of emotional or mental trauma, i.e. the plaintiff fails to exhibit either a serious physical or mental condition requiring medical treatment, psychiatric treatment, counseling or the like, any damages awarded by the jury for intentional infliction of emotional distress under these circumstances necessarily encompass puni-

---

**46.** In reviewing this issue in other jurisdictions, there is no clear majority view. The following jurisdictions have held that recovery for both punitive and emotional distress is double recovery. *See Southern Gen. Ins. Co. v. Holt,* 200 Ga.App. 759, 409 S.E.2d 852, 860 (Ga.Ct.App. 1991), *aff'd in part, rev'd in part,* 262 Ga. 267, 416 S.E.2d 274 (Ga.1992)(stating that damages for intentional infliction of emotional distress and punitive damages "constituted impermissible double recovery" where suit brought against insurer for bad-faith refusal to settle underlying action); *Kewin v. Massachusetts Mut. Life Insur. Co.,* 79 Mich.App. 639, 263 N.W.2d 258, 266 (Mich.Ct.App.1978) *aff'd in part, rev'd in part,* 409 Mich. 401, 295 N.W.2d 50 (1980)(stating that "we held that exemplary damages could not be recovered in this type of case because it was possible to recover damages for mental anguish and exemplary damages were intended to compensate for the same injuries" where mental anguish arose from insurer's alleged bad faith refusal to honor valid claim); *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157, 165 (Ill.1961) (concluding where widow's severe emotional distress arose from defendant's threat to murder widow's husband and fulfillment of threat that "punitive damages cannot be sanctioned as an additional recovery in ... [an intentional infliction of emotional distress] action. Since the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive.").

Interestingly, even though the above-referenced jurisdictions have not specifically held that punitive damages constitute a double recovery only when there are damages for intentional infliction of emotional distress with no concomitant physical injury, in each of the above-cited cases, the facts of those cases are consistent with this distinction.

In contrast, other jurisdictions have found that punitive damages awarded in addition to damages for intentional infliction of emotional distress do not constitute a double recovery. *See Heller v. Pillsbury Madison & Sutro,* 50 Cal. App.4th 1367, 58 Cal.Rptr.2d 336, 350 (Cal.App. 1996) ("punitive damages are recoverable for intentional infliction of emotional distress"); *Hall v. May Dep't Stores Co.,* 292 Or. 131, 637 P.2d 126, 134–37 (Or.1981), *abrogated on other grounds by McGanty v. Staudenraus,* 321 Or. 532, 901 P.2d 841 (Or.1995) (stating that punitive damages are recoverable in principle under theory of intentional infliction of emotional distress); *Gianoli v. Pfleiderer,* 209 Wis.2d 509, 563 N.W.2d 562, 569 (Wis.Ct.App.), *rev. denied,* 211 Wis.2d 530, 568 N.W.2d 298 (Wis.1997) (upholding lower court's award of punitive damages based upon action for intentional infliction of emotional distress); *Hall v. Montgomery Ward & Co.,* 252 N.W.2d 421, 425 (Iowa 1977) (finding that employee was entitled to collect punitive damages as well as compensatory damages for intentional infliction of emotional distress).

tive damages[47] and, therefore, an additional award for punitive damages would constitute an impermissible double recovery. Where, however, the jury is presented with substantial and concrete evidence of a plaintiff's serious physical, emotional or psychiatric injury arising out of the intentional infliction of emotional distress, i.e. treatment for physical problems, depression, anxiety, or other emotional or mental problems, then any compensatory or special damages awarded would be in the nature of compensation to the injured plaintiff(s) for actual injury, rather than serving the function of punishing the defendant(s) and deterring such future conduct, a punitive damage award in such cases would not constitute an impermissible double recovery. To the extent that this holding conflicts with our decision in *Dzinglski*, it is hereby modified. *See* 191 W.Va. at 281, 445 S.E.2d at 222, Syl. Pt. 8. Where a jury verdict encompasses damages for intentional infliction of emotional distress, absent physical trauma, as well as for punitive damages, it is incumbent upon the circuit court to review such jury verdicts closely and to determine whether all or a portion of the damages awarded by the jury for intentional infliction of emotional distress are duplicative of punitive damages such that some or all of an additional award for punitive damages would constitute an impermissible double recovery. If the circuit court determines that an impermissible double recovery has been awarded, it shall be the court's responsibility to correct the verdict.

■ This holding is in no way to be construed as requiring corroboration of a plaintiff's intentional infliction of emotional distress claim, nor are we requiring the introduction of expert testimony to prove the plaintiff's claim. *See Slack*, 188 W.Va. at 152, 423 S.E.2d at 555; Syl. Pt. 4, *Tanner v. Rite Aid of West Virginia*, 194 W.Va. 643, 461 S.E.2d 149 (1995). All that we intend from this decision is that in order to collect damages for intentional infliction of emotional distress, as well as punitive damages in the same action, the jury must be presented with some quantifiable measure of compensatory damages sustained from the intentional infliction of emotional distress so that it is clear that those damages are not duplicative punitive damages.

The evidence presented by the Appellee in the instant case with regard to the mental and emotional damages she sustained was scant. The Appellee testified that "[t]hey [the Appellants] destroyed my professional reputation" and how she trusts people, that "they probably tore me down as a person, I think," and that "I just am not happy, I'm depressed most of the time." Additionally, the Appellee's mother, with whom the Appellee resides, testified that her daughter was a "completely different person" who didn't trust her family anymore because of what occurred. She also stated that her daughter had become irritable and withdrawn.

In light of the paucity of evidence presented by the Appellee with regard to the mental and psychological damages sustained as a result of the Appellants' actions, this case presents a prime example of the type of case originally contemplated by this Court in *Dzinglski*,[48] where the compensatory damages awarded for intentional infliction of emotional distress are indeed punitive in na-

---

**47.** We recently held in syllabus point five of *Stump v. Ashland, Inc.*, 201 W.Va. 541, 499 S.E.2d 41 (1997), that "[u]pon appropriate proof, both compensatory and punitive damages may be awarded to a plaintiff in an action for *negligent* infliction of emotional distress." We also stated in *Stump*, however, that in a negligent infliction of emotional distress case, "the focus is on the seriousness of the emotional distress suffered by the plaintiff. The seriousness of this distress *must* be proved through the use of medical and psychiatric evidence." 201 W.Va. at 552–53, 499 S.E.2d at 52–53 (emphasis added); *accord Heldreth v. Marrs*, 188 W.Va. 481, 491, 425 S.E.2d 157, 167 (1992).

**48.** In *Dzinglski*, the plaintiff's claim for intentional infliction of emotional distress without physical trauma arose out of the plaintiff's employer's investigation of the plaintiff for alleged improprieties. *See* 191 W.Va. at 281–83, 445 S.E.2d at 222–24. Those improprieties included approving payment for salaried supervisory employees who performed no actual work and accepting kickbacks. *Id.* The jury awarded the plaintiff $500,-000 in compensatory damages, as well as punitive damages. *Id.* at 283, 445 S.E.2d at 224. The circuit court set aside the punitive damages award. *Id.*

ture.[49] It is clear that in its award of damage for the Appellee's emotional distress, the jury was, in effect, punishing the Appellants for their intentional and outrageous conduct. Accordingly, the trial court erred in not granting the Appellants' motion for remittitur setting aside the punitive damages awards entered against them on the grounds that punitive damages are duplicative of the jury's award of damages for intentional infliction of emotional distress. *See Mace,* 188 W.Va. at 67, 422 S.E.2d at 634 (upholding jury's damage award for intentional infliction of emotional distress and finding punitive damage award unwarranted).

Based on the foregoing, the decision of the Circuit Court of Kanawha County is affirmed in part and reversed in part and remanded so that the trial court can enter an order remitting the punitive damages previously awarded in this case.

Affirmed, in part; reversed, in part; and remanded with directions.

MAYNARD, Justice, concurring in part, and dissenting in part:

(Filed Dec. 19, 1997)

I dissent in part because I simply fail to see a tort here. This is just another case where a hospital is forced to pay hundreds of thousands of dollars in damages when it did nothing wrong.

I concur with the majority that the trial court erred in not granting the appellants' motion for remittitur, which would have set aside the punitive damages award. I would, however, reverse the entire jury verdict in this case. Here, I address two of the issues upon which I disagree with the majority. First, I disagree with the majority's conclusion that the trial court did not err in refusing to direct a verdict in favor of the appellants on the constructive retaliatory discharge issue. I also disagree with the unwarranted modification of this Court's holding in *Dzinglski v. Weirton Steel Corp.,*

191 W.Va. 278, 445 S.E.2d 219 (1994), in Syllabus Point 14 of the majority opinion.

I agree with the appellants that the appellee failed, as a matter of law, to show that any of her actions were in support of a substantial public policy of the State and to establish the necessary elements of a constructive discharge. I believe the West Virginia Code of State Regulations § 64–12–14.2.4 (1987) is simply too general and indefinite to be considered a substantial public policy. When this Court chose the phrase "substantial public policy" in *Harless v. First National Bank ("Harless I"),* 162 W.Va. 116, 246 S.E.2d 270 (1978), it was articulating the narrow parameters of an exception to the at will employment doctrine. The substantial public policy exception certainly does not encompass every broad policy pronouncement found in the voluminous code of state regulations.

Also, I do not believe the appellee established the necessary elements of a constructive retaliatory discharge. "In order to prove a constructive discharge, a plaintiff must establish that working conditions created by or known to the employer *were so intolerable that a reasonable person would be compelled to quit.*" Syllabus Point 6, in part, *Slack v. Kanawha County Housing,* 188 W.Va. 144, 423 S.E.2d 547 (1992) (emphasis added). Concerning this issue, the majority states:

> In the present case, the evidence presented by the Appellee revealed that she regularly worked her shifts for over two years alone, without either another nurse or care giver to assist her. Moreover, at times, she was left alone on her shift to care for up to nine seriously ill patients.

This evidence, however, is plainly not relevant to the necessary elements of a constructive retaliatory discharge. The conditions described above were the normal working conditions of the position held by the appellee. *Anyone* holding the same position of the

---

**49.** We do not by our opinion seek to blur the distinction between actual damages for emotional injury, damage to reputation and mental anguish (which are given as the result of and in an amount determined by the degree of a party's injury) and punitive damages, which are imposed in addition to such actual damages. In the instant case, however, we believe the jury clearly blurred this line, and the jury clearly incorporated punitive damages into its calculation of actual damages.

appellee would have worked under these exact conditions. Even if the appellee had not complained to and angered her supervisor, she would still have operated under the conditions described above. In other words, these conditions *had nothing to do with retaliation.* In constructive retaliatory discharge cases, the plaintiff must show a nexus between her actions in support of a substantial public policy and the creation of intolerable working conditions by the employer. Here, there is no such nexus. In fact, under the Court's reasoning here, anyone finding the regular conditions of her job stressful and demanding could simply quit and have a cause of action for constructive retaliatory discharge. Absent the evidence concerning the demanding nature of the appellee's job, the appellee is left with evidence of a reprimand, a below average evaluation, and disputed testimony concerning denied requests for vacation time and transfers. Such evidence clearly does not rise to the level of showing conditions so intolerable that a reasonable person would be compelled to quit.

Second, I dissent to the modification of this Court's holding in Syllabus Point 8 of *Dzinglski v. Weirton Steel Corp.,* 191 W.Va. 278, 445 S.E.2d 219 (1994):

In permitting recovery for emotional distress without proof of physical trauma when the distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages.

In *Dzinglski,* this Court explained:

In *Mace v. Charleston Area Medical Center Foundation, Inc.,* 188 W.Va. 57, 422 S.E.2d 624, 633 (1992), we expressed our concern that in cases where damages for emotional distress are sought, "a claim for emotional distress without any physical trauma may permit a jury to have a rather open hand in the assessment of damages." In *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982), we recognized that in permitting recovery for emotional distress without proof of physical trauma where the

distress arises out of the extreme and outrageous conduct intentionally caused by the defendant, damages awarded for the tort of outrageous conduct are essentially punitive damages. Therefore, in many cases emotional distress damages serve the policy of deterrence that also underlies punitive damages.

By allowing the jury to consider punitive damages, the trial court permitted the jury to stack punitive damages upon punitive damages, thereby effectively imposing two punitive damage verdicts against Weirton Steel for the same acts.

*Dzinglski,* 191 W.Va. at 288, 445 S.E.2d at 229. The requirement of proof of physical trauma is to show the need for compensatory damages and guarantee that punitive damages are not awarded twice. It prevents an openendedness in the jury's assessment of damages.

In Syllabus Point 14 of the majority opinion, all of this is undone. Now added to proof of physical trauma is "concomitant medical or psychiatric proof of *emotional or mental trauma, i.e. the plaintiff fails to exhibit either a serious physical or mental condition requiring medical treatment, psychiatric treatment, counseling or the like[.]* " (Emphasis added). Now, in order to receive "compensatory damages" in addition to punitive damages, a plaintiff must simply present substantial evidence of some kind of *"treatment for ... depression, anxiety, or other emotional or mental problems[.]* " (Emphasis added). This syllabus point is an invitation to a jury to stack punitive damages upon punitive damages. Notable is the fact that expert psychiatric testimony apparently is not required to show the seriousness of the plaintiff's emotional or mental condition, since the majority states in the opinion, "nor are we requiring the introduction of expert testimony to prove the plaintiff's claim." In light of this new rule, what plaintiff in a tort of outrage claim will not testify to experiencing emotional or mental problems as a result of the defendant's conduct. Not having the benefit of this syllabus point, the appellee in the instant case apparently did not cry big enough tears on the witness stand. I reiterate that this new rule is a step backward in

allowing juries a free hand in awarding punitive damages in the guise of "compensatory" damages for "emotional and mental injuries" in addition to damages assessed against the defendant based on his conduct. It is an open invitation for the awarding of double recoveries. Further, I do not believe that Syllabus Point 15 of the majority opinion does much to mitigate this danger. The majority opinion reintroduces an openendedness into this area of the law that *Dzinglski* was designed to correct.

In conclusion, for the reasons stated above, I dissent in part. I reiterate that I would reverse the entire jury verdict in this case.