FILED

November 17, 2016

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**No. 15-0695 –** *Thomas Memorial Hospital v. Susan Nutter*

**WORKMAN, Justice, dissenting, joined by DAVIS, Justice.**

I cannot and will not agree to join an opinion which, in effect, arrogantly assumes the position that a select group of individuals, namely appellate judges, are better able to determine the credibility of witnesses and the facts of the case than are the group of average citizens who sat as jurors and actually watched the evidence unfold at trial. Although the jury system is not perfect, it is clearly the best system in the world for deriving the truth of facts and under proper instruction of law, assessing liability. (The people of West Virginia felt that way, too, when they adopted our Constitution.[1]). Accordingly, this Court has consistently held that verdicts rendered by a jury are to remain, for the most part, undisturbed by the trial court. When a case involves conflicting testimony and it has been fairly tried, "the verdict of the jury will not be set aside unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." Syl. Pt. 4, in part, *Laslo v. Griffith,* 143 W.Va. 469, 102 S.E.2d 894 (1958); *see also Lodis v. Corbis Holdings, Inc.*, 366 P.3d 1246, 1249 (Wash. App. Ct. 2015), *review denied*, 377 P.3d 744 (2016) ("Trials matter. The results of trials matter.").

---

[1]West Virginia Constitution article III, § 13, provides, in part: "In suits at common law, where the value in controversy exceeds twenty dollars exclusive of interest and costs, the right of trial by jury, if required by either party, shall be preserved[.]"

1

This Court has proclaimed its esteem for the knowledge, wisdom, and judicial acumen of trial judges in matters of this kind. We have said that:

> "[T]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, *Sanders v. Georgia-Pacific Corp.,* 159 W.Va. 621, 225 S.E.2d 218 (1976).

Syl. Pt. 2, *Estep v. Mike Ferrell Ford Lincoln-Mercury, Inc.*, 223 W.Va. 209, 672 S.E.2d 345 (2008). It is imperative that this Court accord trial judges *great respect* in making these rulings because they have the "unique opportunity to consider the evidence in the living courtroom context," while appellate judges are at a severe disadvantage because we can see only a "cold paper record[.]" *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438 (1996) (citation omitted).[2]

Instead, the majority ignores decades of precedence, shows no deference whatsoever to the trial court's judgment, and presents a complete "gloss job" of the facts. What is beyond troubling, however, is the majority's blatant disregard for the jury's reasoned verdict and patent refusal to apply well-settled law in a neutral way.

---

[2]*See also Read v. Shu*, 615 A.2d 109, 110 (Pa. Super. Ct. 1992) ("An appellate court by its nature stands on a different plane than a trial court. Whereas a trial court's decision to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge.").

Syllabus point five of *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983) *cert. denied,* 469 U.S. 981 (1984), controls the standard of review for Thomas Hospital's motion for judgment as a matter of law filed pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure:

> In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

In this case, that rule is cited by the majority but then, utterly disregarded by it.

The appropriate inquiry of this Court is whether there was sufficient evidence to support the jury's verdict; the answer to that question is an obvious "Yes." Thomas Hospital's treatment of Ms. Nutter was appalling. Thomas Hospital falsely accused Ms. Nutter of fraudulent charting, fired her, and then filed a false complaint with the Board of Nursing. The jury heard how Thomas Hospital's actions devastated Ms. Nutter professionally, financially, and emotionally. And the jury decided that Ms. Nutter was entitled to be compensated fairly and accurately for injuries directly attributable to Thomas Hospital's retaliatory treatment of her.

On what basis, therefore, does the majority reverse the jury's award? It concludes that Ms. Nutter's claims for retaliatory discharge and intentional infliction of emotional distress fail as a matter of law. The majority goes on to reverse the jury's verdict on unpaid wages under the Wage Payment and Collection Act and remands the case for a new trial on that single issue based on the trial judge's conduct. The majority's analysis is remarkably wrong on those claims.[3]

The majority ultimately concludes it is "simply unable to find *any* evidence from which a jury could conclude that Thomas Memorial contravened some substantial public policy principle." (Emphasis added). That is a jaw-dropping statement considering the 3,647 page appendix record. This outlandish declaration springs from a diseased root: an exalted impression of the role of the members of this Court; it is an assertion of appellate supremacy over the fact-finding function of the jury. The majority envisions this Court as enthroned and empowered to decide questions of fact and credibility whenever it believes the jurors got a case wrong. This image of the Court would have been unrecognizable to those who ratified our Constitution.

---

[3] The majority finds that the cause of action for defamation was barred by a one-year statute of limitation. I do not disagree with that determination. Nevertheless, as discussed below, Thomas Hospital did not request to have the jury make special findings as to its liability on each of the issues. Therefore, Ms. Nutter is entitled to receive all the damages awarded by the jury because it could have attributed those damages to her retaliatory discharge claim. *See* Syl. Pt. 6, *Orr*, 173 W.Va. 335, 315 S.E.2d 593.

To arrive at the result *it* fancies, the majority has disregarded the applicable case law, resolved disputed facts in favor of Thomas Hospital, invaded the trial court's discretion, and treated the considered judgment of the jurors in a cavalier manner. However, the jury was far closer to the presentation of the facts than this Court could ever be through appellate review. It is not the prerogative of this Court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function. As discussed more fully below, the jury reached its conclusion within the parameters of the evidence presented. Furthermore, the trial court's behavior, while not flawless, did not warrant reversal of a jury verdict.

**Evidence Established Retaliatory Discharge**

When we review the evidence in the light most favorable to Ms. Nutter, it is clear that she presented sufficient evidence of retaliatory discharge to support the jury's verdict. This case is patently similar to *Tudor v. Charleston Area Medical Center, Inc.*, 203 W.Va. 111, 506 S.E.2d 554 (1997), wherein we found there was ample evidence from which the jury could find that the hospital acted with a "bad motive" in discharging a nurse because she complained about inadequate staffing and such discharge violated a substantial public policy set forth in regulations regarding registered nurse ("RN") staffing.

In this case, there can be no reasonable disagreement that the Med-Psych unit was chronically understaffed. Upon hire, Thomas Hospital told Ms. Nutter that there

5

would be an RN, a licensed practical nurse ("LPN"), two mental health technicians ("MHTs), and a unit clerk assigned to work the Med-Psych unit during her shift. The unit did not operate with this full complement of staff, however. In reality, one RN, one LPN, and one MHT worked on the Med-Psych unit each midnight shift. Beverly Carnifax, an MHT on the Med-Psych unit, corroborated Ms. Nutter's testimony that there were supposed to be two MHTs on the unit. However, throughout 2008 and 2009, Ms. Carnifax was the only MHT assigned to the unit. Ms. Carnifax admitted that "[w]e always complained about not having enough help. We complained among ourselves and just did the work."

With only one MHT and no unit clerk to assist her, Ms. Nutter had difficulty attending to the patients and completing her charting during the shift because her "main concern was the patient and the safety of the patients." Ms. Nutter voiced concerns with her supervisor, Christina Edens, RN, that three full-time employees on that unit were not enough to provide appropriate care to these patients because of the "acuity of the patients," their "cognitive levels, and the fact that they [had] . . . uncontrolled behaviors and were a danger to themselves and others[.]"[4]

---

[4]During her tenure at Thomas Hospital, Ms. Nutter raised several other patient safety concerns issues with her supervisor.

6

Thomas Hospital was cited by the Centers for Medicare and Medicaid Services ("CMS") in February of 2008 for deficiencies in staffing. CMS found that the standard set forth in 42 Code of Federal Regulations § 482.23(b) (2008)[5] regarding staffing and delivery of care was not met based on a review of the third floor staffing plan, staff schedules, staff assignments and patient census. The CMS found this deficiency had "the potential to adversely effect [sic] the care of all patients on the Third Floor Med/Surg Unit;" the unit adjacent to the Med-Psych unit. When asked if there were enough staff on the Med-Psych unit to meet this CMS requirement, Ms. Nutter answered "No" and explained:

> Well, if we had patients who were suicidal, we had to watch them. You know, so that they didn't get in their rooms and maybe if they had gotten hold of something that [they] could harm themselves with, slit their wrists or hang themselves. So we had to really keep them under observation every five minutes.

> Also, [there] were patients . . . [with] severe dementia, and . . . impulse control problems . . . they would be fine one minute, they could be beside another patient maybe in their rooms, if one patient maybe touched or took another patient's object, they would break out in a fist fight and hurt each other. Those types of things went on 24 hours a day.

---

[5]42 Code of Federal Regulations § 482.23 provides:

b) Standard: Staffing and delivery of care. The nursing service must have adequate numbers of licensed registered nurses, licensed practical (vocational) nurses, and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each department or nursing unit to ensure, when needed, the immediate availability of a registered nurse for bedside care of any patient.

Ms. Nutter testified that she cared for challenging patients at the Med-Psych unit and patient care was her first priority. This ten-bed unit served elderly patients who had medical issues too serious for a nursing home and patients with psychiatric issues too serious for the general population of the hospital. Ms. Nutter testified that

> out of ten patients there were many days that I would have 7 to 8 patients that could not lift a spoon to their mouth. You know, they couldn't bathe themselves. You had to assist with showers. You had to feed them. You had to make sure that – they were high fall risk. You know, [the patients were] 60, 70, 80, 90 years old, [and nurses had to make] . . . sure when they were ambulating, they didn't fall and hurt themselves.

Had a second MHT and unit clerk been assigned to her shift to assist Ms. Nutter with patient needs, charting, and paper work, she could have spent the time needed to provide appropriate nursing care. Ms. Nutter would stay over her shift to complete charting but management discouraged this practice because it led to overtime. However, Ms. Nutter told the jury that overtime "was severely frowned upon. And Christina [Edens, her supervisor] would be upset with me." At times, Ms. Nutter would clock out and stay to complete her paperwork. In February of 2009, Thomas Hospital placed Ms. Nutter on a work improvement plan that stretched into May of 2009; instead of providing sufficient staffing, Thomas Hospital told Ms. Nutter to "improve her time management skills."

The Med-Psych unit required that an RN be present at all times; because there was only one RN per shift assigned to the unit, Ms. Nutter frequently worked

8

twelve or thirteen hour shifts with no breaks or lunch breaks. If she needed to leave the unit to take a break, Ms. Nutter would have to call other units to see if someone could come to relieve her. However, the other units were understaffed as well, so often they could not relieve her. A witness *called by Thomas Hospital* confirmed this situation; Rebecca Chandler, an RN who worked the midnight shift on the Med-Psych unit, was asked if she "never took a lunch break or other break because there wasn't anybody to relieve you?" And she answered, "[t]hat's right." These RNs worked *twelve hour shifts* with little to no opportunity to step away from the unit to take a break. No one should have to work under these intolerable conditions. More to the point, however, these acutely ill patients deserved appropriate medical staff. In fact, Thomas Hospital was required by federal regulation to provide adequate numbers of nurses "and other personnel to provide nursing care to all patients as needed. There must be supervisory and staff personnel for each . . . nursing unit to ensure, when needed, *the immediate availability of a registered nurse for bedside care of any patient*." 42 C.F.R. § 482.23 (emphasis added).

The evidence also established that Ms. Nutter was the recipient of reprisals for voicing concerns about patient safety issues including appropriate staffing. Ms. Nutter testified that she overheard Ms. Edens plotting to discharge her. Eventually, their working relationship deteriorated to the point that Ms. Edens "ostracized" Ms. Nutter "and very nearly just quit communicating with" her. For instance, Thomas Hospital issued Ms. Nutter a written warning for leaving the unit to take a break to gain

9

composure after caring for a patient who passed away. This incident occurred about a week after Ms. Nutter's mother, who also suffered with dementia, died. Ms. Nutter was unable to find an available RN to cover the unit, but she did make sure a physician assistant remained on the unit when she took this short break. The jury also heard that Thomas Hospital retaliated against Ms. Nutter financially and failed to pay her the enhanced charge nurse pay even though she brought that matter to the attention of Ms. Edens repeatedly.

With regard to Ms. Nutter's retaliatory discharge claim, she identified several CMS regulations as the sources of substantial public policies of West Virginia. However, one regulation is so directly on point with this Court's holding in *Tudor* that there is no need to discuss the others. The Medicare provision regarding RN staffing, 42 C.F.R. § 482.23, is nearly identical to the language of the State regulation found by this Court to constitute substantial public policy in *Tudor*:

> West Virginia Code of State Regulations § 64-12-14.2.4 (1987) sets forth a specific statement of a substantial public policy which contemplates that a hospital unit will be properly staffed to accommodate the regulation's directive; to ensure that patients are protected from inadequate staffing practices; and to assure that medical care is provided to hospital patients, especially children and young adolescents, who must depend upon others to protect their medical interests and needs.

Syl. Pt. 5, *Tudor*, 203 W.Va. at 111, 506 S.E.2d at 554. Therefore, the trial court's ruling with regard to the retaliatory discharge claim is entirely consistent with our holding in

*Tudor*. In view of our prior precedent on the dispositive issue presented in this case, a memorandum decision affirming the jury verdict would have been appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

The majority does not even attempt to distinguish *Tudor* legally because clearly it recognized that would be an exercise in futility. In its paltry attempt to distinguish *Tudor* factually, the majority sifts through the evidence in both cases and essentially determines that the plaintiff in *Tudor* had a better case than Ms. Nutter because she had more documentary evidence. The majority is eager – even hungry – to tell everyone how it thinks Ms. Nutter *should* have presented her case. But the majority can reach its ultimate conclusion to overturn the jury verdict only by itself weighing the evidence in favor of Thomas Hospital. The bottom line, however, is that the three members of the majority discredit Ms. Nutter's testimony when the jury believed her; by doing so, the majority usurps the proper role of the jury and denies Ms. Nutter her constitutional right to a jury trial.

Not surprisingly, the majority's recitation of the facts leaves out important parts of the story. It finds that Ms. Nutter "could not explain the time overlap or the conflicting documentation." Actually, Ms. Nutter was given no opportunity to do so. *See* note 6 *infra*. The majority also notes that Ms. Nutter "admitted to the human resources department that she thought her nurse manager was 'doing an excellent job[.]'" Actually, the human resources manager, Marybeth Smith, was not available to meet with Ms.

11

Nutter, and she was referred to Beth Davis who was the nurse recruiter. Ms. Nutter explained this conversation as follows:

> I said that I knew Christina [Edens] was under a tremendous amount of pressure because Joint Commission was coming for an inspection and Medicare was coming for an inspection, and even though I felt conflicted in my emotions about the things that were going on and what she was saying, and the discussion that I had overheard . . . I was not going to complain to Beth Davis because she was a nurse recruiter. And I did not know, understand the realm of her responsibility, and I just didn't want to get Christina [Edens] in trouble. She was under tremendous amount of pressure. This was her first management job, I was trying in every way that I knew to be supportive of her.

In spite of her unreciprocated loyalty to Ms. Edens, Ms. Nutter did report to Ms. Davis that she was in a "hostile work environment" and asked for a transfer. The majority also fails to mention the fact that the Med-Psych unit operated with only one MHT; the majority only discusses the void left by the absence of the unit clerk.

There is evidence of record to support the jury's verdict and that alone is enough for this Court to resolve the case. RN staffing was a problem at Thomas Hospital even before Ms. Nutter was hired and the problem persisted. She complained to her supervisor about the difficulty meeting patient needs. Following these complaints, Ms. Nutter's working environment grew "hostile" and she was ultimately discharged. Based on this evidence, the jury concluded that Ms. Nutter was targeted for termination as a result of those complaints in violation of a substantial public policy of this State.

The jury heard Ms. Nutter describe the termination meeting in disturbing

detail.[6] It is clear from her testimony that Thomas Hospital was determined to fire Ms.

[6]Ms. Nutter stated that:

> I ran into Christina Edens and Sarala Sasahendrin in the hallway. And they said, "Come join us, we're going up here to the personnel office." So I went with them and did not realize anything about why we were there.
>
> And we entered into Marybeth Smith's office and Christina began the discussion. And she said, "We have called you in here today because . . . on chart audits, we have found where you charted a group, a group session while there was another group session going on with the recreation therapist." And they told me that it had happened on Thursday.
>
> So I had to think because so much had happened over the weekend. And my response to that was, "Christina, I did not do a group session on Thursday when I returned to work. I did individual one on one sessions with each patient." And she became argumentative and said, "Well, you could not have possibly done it the way you charted it. And therefore, we are – we feel that you have falsified patient records, patient documentation."
>
> And she even went to the point to raise her arm and point and in a rather loud voice said, "There was even one of those patients who had not even been gotten out of the bed for 7 days." Of course, Thursday was my first day back.
>
> So I was very hurt because I felt that she should be yelling at the nurses who had left that patient in the bed for 7 days.
>
> So, I said, "Well, I did one on one with each patient." And I turned to Marybeth [Smith, Human Resources Director] and leaned forward in my chair to try to explain to Marybeth, because I knew she did not understand how patients wandered in and out of rooms or in the hallway.
>
> And as I was leaning forward trying to explain how that the patients traveled on that unit and that I have to keep up with them as a nurse. I have to, you know, be where the

(continued . . .)

13

Nutter and was not interested in allowing her to explain what really happened. The jury

also saw that the hospital's documents actually supported Ms. Nutter's testimony that she

did nothing wrong.[7] Despite this evidence to the contrary, Thomas Hospital's witnesses,

---

patient is. Sarala Sasahendrin had turned her chair sort of towards Marybeth and she chimed in and said, "Well, you could not have possibly done it in the way that you have charted it because it would have taken over ten hours." And she became expressive with her arm and kind of swung her left arm back towards me, and swatted her hand at me.

And I backed up in my chair and my eyes filled with tears. I looked at Marybeth and I said, "Well, I can see that you all have already decided what you are going to do."

And at that point she presented me with a paper that had been turned over face down on her desk and she turned it up and handed it to me. And said, "We are terminating your position. We are terminating you today. We will be contacting the Nursing Board that you have falsified records."

[7]On November 12, 2009, Ms. Nutter charted that from 12:00 to 12:45 she was providing medication education to the nine patients on the unit. During some of this time frame, the recreation therapist, Lara Woodrum, charted that she was showing a video from 11:45 to 12:25. Ms. Woodrum checked "group" for her services, even though she met with only one patient. Ms. Woodrum left the unit and returned later that day. When she noticed her charting overlapped somewhat with Ms. Nutter, Ms. Woodrum e-mailed management that Ms. Nutter did not give the medication counseling when she checked that she did.

However, the medical records show that, of the nine patients involved, only one of them went to see the video with Ms. Woodrum and there was not a recreational "group." The other patients were documented as being in bed or in the hall of the unit and were available to receive the medication counseling from Ms. Nutter. With regard to the remaining patient who watched the film, it ended at 12:25, giving Ms. Nutter time to provide medication counseling between 12:25 and 12:45 to that particular patient.

The charts show that Ms. Nutter was giving the medication education to the patients, "1:1," meaning one-on-one, during the period from 12:00 to 12:45. Ms. Nutter explained that she would talk to a patient about his medications, tend to whatever other needs he may have, then go to the next patient and repeat the same. She would come back around to the patients to reinforce what she told them. Ms. Nutter testified that this was (continued . . .)

14

one by one, still insisted at trial that Ms. Nutter intentionally committed fraudulent charting. Ms. Nutter's attorney annihilated their veracity on cross-examination.

When asked how the termination meeting made her feel, Ms. Nutter responded that: "I was just blown away. I was tearful. I knew that there was no arguing with it." The hospital never gave Ms. Nutter the patient records to look at to defend against these allegations. Ms. Nutter told the jury what happened after the termination meeting:

> Christina Edens escorted me to the unit. I was allowed to get my belongings.
> I wasn't allowed to touch another chart to finish anything. And then she escorted me back out the doors and I took the elevator to my car and sat in my car.
> I was having chest pains and crying. And so I took a nitroglycerin and tried to collect myself so that I could drive home safely.

By the time the jury heard that Thomas Hospital discharged Ms. Nutter, it obviously had determined that the accusations of intentional wrongdoing and fraudulent

---

the only way she knew how to give medication therapy to mentally compromised patients.

The jury was shown Patient Observation Flow Sheets, or "bed checks" that another employee on the same shift, Beverly Carnifax, MHT, with the same patients, documented that she was giving "current events" education to one patient in one room at the same time that she was giving current events training to a person in another room; Ms. Carnifax documented giving current events education to one patient, where the records show that the patient was in the shower. Yet, the jury heard that absolutely nothing was done or even mentioned to this employee. The MHT was not fired, not accused of fraud, not disciplined nor even spoken to by supervisors. These discrepancies were on the very same records that Thomas Hospital used to support their termination and accusations of fraudulent charting against Ms. Nutter.

charting lacked foundation. However, Thomas Hospital took this discharge a step further, and endeavored to ruin Ms. Nutter's career by filing a false complaint with the Nursing Board. Ultimately, the Nursing Board reviewed the information supplied by Thomas Hospital and resolved the complaint in Ms. Nutter's favor *without holding a hearing*. The Nursing Board obviously saw the complete lack of merit in Thomas Hospital's report.[8] When one sees such blatantly false claims, one cannot help but conclude that Ms. Nutter was the victim of a retaliatory discharge.

The jury also heard that Ms. Nutter was ravaged professionally, emotionally, and financially as a result of the termination and false complaint to the Nursing Board. The financial stress and worry about her career and future caused Ms. Nutter to suffer major depression and anxiety. Ms. Nutter's expert witness, psychologist Jeff Harlow, Ph.D., evaluated her and diagnosed a panic disorder, generalized anxiety disorder, an adjustment disorder and depression. Dr. Harlow opined that Ms. Nutter's psychological conditions were permanent and directly related to the termination and complaint to the Nursing Board: "it has been four years since this event, and she is still

---

[8]By letter dated November 17, 2009, Rebecca Brannon, Vice President of Nursing with Thomas Hospital, informed the Nursing Board that the hospital had discharged Ms. Nutter for "falsely document[ing] educational sessions with patients." After reviewing this matter, the Nursing Board notified Ms. Nutter that it would take no action against her license by letter dated July 22, 2010.

having two to three panic attacks a week and she is still having flashbacks of the termination. She is having nightmares about the termination."[9]

Before her termination, fifty-five year old Ms. Nutter was making on average $55,000 to $59,000 a year as an RN. She intended to work as an RN until at least age sixty-seven, and "probably longer than that if [she] was physically able." However, after the discharge, Ms. Nutter was required to report the pending charges with the Nursing Board to any potential employer, which basically eliminated her chances of finding work as an RN for the eight months those charges were pending. Since her termination, Ms. Nutter has worked as a part-time home health aide, a housekeeper, and caregiver. In the year 2010, Ms. Nutter earned approximately $18,000; in the year 2011, she earned approximately $16,000. Ms. Nutter was the sole provider for her teenage daughter; the family struggled financially and plummeted into poverty.

For purposes of this Court's analysis, it is unnecessary to discuss the evidence Thomas Hospital presented to try to excuse its outrageous behavior. Such

---

[9]On cross-examination, defense counsel asked Dr. Harlow about Ms. Nutter's previous hospitalization at a psychiatric facility. Dr. Harlow explained that Ms. Nutter had a history of psychological treatment following the loss of her sixteen-year-old son to suicide in 2003. He opined that some of her psychological conditions were related to the loss of her son. However, looking at her records demonstrated that "she was able to get to a point where she could cope better with" it and "move on and go on with her life" even though there was always going to be an undercurrent of grief and depression." For instance, Ms. Nutter was able to return to work as a nurse and support herself and her daughter.

17

evidence was placed before the jury and it was firmly rejected; any issue therein would relate to the jury's assessment of the credibility of the witnesses. *See State v. Guthrie*, 194 W.Va. 657, 669, 461 S.E.2d 163, 175 (1995) ("Credibility determinations are for a jury and not an appellate court."). Because there was substantial evidence to support the jury's verdict, the trial court was correct to deny Thomas Hospital's motion for judgment as a matter of law.

How can the majority possibly escape this painfully obvious conclusion? Although the majority claims the mantle of precedent, it is unable to identify a single case that endorses its essential premise, namely, that a plaintiff who prevails following a jury trial must put forth documentary evidence of the "smoking gun" in a retaliatory discharge case to survive a Rule 50(b) challenge. *See* W.Va.R.Civ.P. 50(b). However, Ms. Nutter explained that she was trying her best to work through the chain of command to solve problems on the unit. Ms. Nutter admitted she kept no documentation because she was addressing her concerns with her supervisor, Ms. Edens, and "wasn't trying to get anybody in trouble on any level."

In *Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 480 S.E.2d 817 (1996), this Court recognized that the ultimate question of whether a plaintiff was the victim of a retaliatory discharge is not always "strikingly obvious from the record[.]" *Id.* at 388, 480 S.E.2d at 827. We astutely observed "that employers rarely discriminate openly." *Id.* Applying the appropriate standard set forth in *Orr*, in *Page*, we found

18

sufficient proof upon which the jury could base its verdict. Moreover, we noted "that the jury had the benefit of observing the testimony and determining the credibility of the evidence presented on behalf of both parties." *Id*. The same rationale rings true in the instant case.

**Damages Related to Retaliatory Discharge Claim**

As in *Tudor*, the verdict form used here allowed the jury to award both special (lost wages) and general (emotional distress and injury to reputation) damages as long as the jury found that liability existed as to any one of the four causes of action on the verdict form. *See Tudor*, 203 W.Va. at 121 n.25, 506 S.E.2d at 564 n.25.[10] Here, the jury found liability existed as to every cause of action. We previously held with regard to general verdicts that

> [w]here a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by the evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues.

Syl. Pt. 6, *Orr*, 173 W.Va. at 339, 315 S.E.2d at 597.

---

[10] In *Tudor*, the plaintiff alleged constructive retaliatory discharge, tortious interference with employment opportunities, defamation, invasion of privacy, and intentional infliction of emotional distress. The jury awarded $500,000 in damages to professional reputation, emotional distress and mental anguish; we found those damages duplicative of the jury's $1,000,000 punitive damage award. *Id*. at 133, 506 S.E.2d at 576. In this case, however, Ms. Nutter withdrew her request for punitive damages.

19

Thomas Hospital did not request to have the jury make special findings as to its liability on each of the issues. Therefore, Ms. Nutter is entitled to receive all the damages awarded by the jury because it could have attributed those damages to her retaliatory discharge claim. It is therefore wholly unnecessary to address Thomas Hospital's arguments regarding Ms. Nutter's claims of defamation and the tort of outrage.

### Trial Judge's Conduct Did Not Unfairly Prejudice Thomas Hospital

Thomas Hospital devotes half of its brief to arguing that the trial was fundamentally unfair as a result of the trial judge's questions and comments; Thomas Hospital lays blame for the jury verdict against it wholly at the trial judge's doorstep. Ms. Nutter responds that most of the questions posed by the trial judge elicited testimony that was neither hurtful nor helpful to either side, but simply filled in information for the jury. Ms. Nutter also asserts that defense counsel was disruptive and disrespectful to the court by repeatedly interrupting the trial and approaching the bench. It does appear that defense counsel attempted to bait the court, perhaps in the goal of creating a record that could aid him on appeal.

As we held in syllabus point one of *Alexander ex rel. Ramsey v. Willard*, 208 W.Va. 736, 542 S.E.2d 899 (2000): "'The plain language of Rule 614(b) of the West Virginia Rules of Evidence authorizes trial courts to question witnesses -- provided that such questioning is done in an impartial manner so as to not prejudice the parties.' Syl. Pt. 3, *State v. Farmer,* 200 W.Va. 507, 490 S.E.2d 326 (1997)." While the trial judge has

20

wide discretion in the conduct of trial, he or she must not make comments or insinuations, by word or conduct, indicative of an opinion on the credibility of a witness or the argument of counsel. Because of the judge's large influence over the jury, he or she must exercise a high degree of care to remain impartial, and to not display prejudice or favor toward any party.[11]

In *Alexander*, we recognized that in order to resolve an allegation of prejudicial conduct by a trial court, a reviewing court is obligated to evaluate the entire record. 208 W.Va. at 744, 542 S.E.2d at 907. In this case, some of the trial court's leading questions and remarks could be characterized as improper and/or unnecessary.

---

[11]Historically, a trial judge's role in the administration of justice compelled him to act as more than a simple referee between opposing counsel.

> "In the courts of the United States, as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts." And again: "Trial by jury in the courts of the United States is a trial presided over by a judge, with authority, not only to rule upon objections to evidence and to instruct the jury upon the law, but also, when in his judgment the due administration of justice requires it, to aid the jury by explaining and commenting upon the testimony, and even giving them his opinion on questions of fact, provided only he submits those questions to their determination."

*Capital Traction Co. v. Hof*, 174 U.S. 1, 16 (1899) (citations omitted).

21

Nevertheless, in view of the totality of the eight-day trial, I have no qualms whatsoever in concluding that the trial court's behavior affected the jury's verdict not at all.

It was the strength of Ms. Nutter's case that caused the jury to award her more than $1 million in damages. After reviewing this record, it is abundantly clear that Thomas Hospital was teetering on the edge of losing this case before Ms. Nutter even took the stand. Ms. Nutter's counsel called a parade of Thomas Hospital's employees in her case-in-chief and they all were thoroughly impeached as the pretense for the discharge was so repugnantly transparent. In stark contrast, Ms. Nutter took the stand on day four of the trial and offered compelling, articulate testimony that makes even this cold appellate record shock one's sense of decency and fair play. By the time Ms. Nutter stepped down from the witness stand, her case for retaliatory discharge was well-supported by the evidence. For this reason, the decision of the jury, exercising its common sense and sound honest judgment regarding the evidence it saw and heard firsthand, should not be overturned. Thomas Hospital was given every opportunity to fairly defend its case during an eight-day jury trial, but failed. The trial court recognized this truth after conducting the trial and it properly denied Thomas Hospital's motion for judgment as a matter of law.

Under any impartial analysis of the record, this Court should have affirmed that ruling. Instead, the majority suspends ordinary rules of law in its shameful decision to bestow unmerited victory to Thomas Hospital. Regrettably, the majority pays no heed

to the appropriate role of this esteemed Court when it reverses a jury and trial court upon such lax standards.

I am authorized to state that Justice Davis joins me in this dissent.